RECEIVED
IN LAKE CHARLES, LA.

JUL 11 2013

TONY R. MOORE, CLERK
BY————————————
DEPUTY

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAKE CHARLES DIVISION

| | | |
|---|---|---|
| PIONEER EXPLORATION, LLC | : | DOCKET NO. 2:09-CV-00308-PM-KK |
| VS. | : | JUDGE MINALDI |
| STEADFAST INSURANCE CO. | : | MAGISTRATE JUDGE KAY |

### MEMORANDUM RULING

Before the court is a Motion for Summary Judgment [Doc. 30], filed by the defendant, Steadfast Insurance Company ("Steadfast"). Pioneer filed a response [Doc. 42], and Steadfast filed a reply [Doc. 48]. The undersigned heard oral argument on this motion on Thursday, June 20, 2013, at 10:00 a.m., and took the motion under advisement. Considering the arguments made by counsel on the briefs and during oral argument, Steadfast's Motion for Summary Judgment is GRANTED.

### FACTUAL BACKGROUND

This case arises out of an insurance coverage dispute between an oil and gas company (Pioneer) and its insurer (Steadfast). Pioneer originally filed suit in the 38th Judicial Court for Cameron Parish, Louisiana. Steadfast timely removed on the basis of diversity jurisdiction, 28 U.S.C. § 1332.[1]

### A. Well Blowout and Subsequent Remediation

Pioneer operated a gas well in Cameron Parish called the MRS SUB J.M. Meaux Well No. 1, Louisiana Office of Conservation Serial Number 101203 ("Meaux No. 1 Well").[2] The

---

[1] Not. of Removal, [Doc. 1].

[2] Def.'s Statement of Uncontested Material Facts to Mot. for Summ. J., [Doc. 30-2] at ¶ 1; Pl.'s Resp. to Def.'s Statement of Uncontested Material Facts, [Doc. 42-1] at ¶ 1.

1

well is located on property owned by John Brent Meaux and Jimmi Meaux McLean, and is leased by Pioneer under a mineral lease which covers roughly 284.52 acres in Cameron Parish.[3] In January 2008, the well suffered a blowout, and salt water and fluids flowed from the wellhead until March 2008.[4] The contamination ultimately covered roughly 12 acres of land, with a portion of the contamination seeping over into a neighbor's property.

Pioneer began clean up soon after the blowout. This included constructing levees and impounds to contain the salt water and keep it from flowing onto nearby land, which Pioneer claims prevented the contamination from spreading to roughly 315 acres beyond the Meaux property.[5] When the impounds threatened to overflow, Pioneer used specialized vehicles called "vacuum trucks" to suction and remove the fluids and transport them to commercial salt-water disposal facilities.[6] After plugging the well, Pioneer also hired a remediation company called Carr Environmental Group to perform remediation.[7]

In the meantime, the Louisiana Department of Natural Resources, Office of Conservation ("LDNR"), issued an order threatening to fine Pioneer $5,000 per day if Pioneer did not

---

[3] Def.'s Statement of Uncontested Material Facts at ¶ 3; Pl.'s Resp. to Def.'s Statement of Uncontested Material Facts at ¶ 3.

[4] Def.'s Statement of Uncontested Material Facts at ¶ 2; Pl.'s Resp. to Def.'s Statement of Uncontested Material Facts at ¶ 2.

[5] Rehman Aff., Ex. 1 to Pl.'s Opp. to Mot. for Summ. J., [Doc. 42-3], at ¶ 8; Mock Aff., Ex. 2 to Pl.'s Opp. to Mot. for Summ. J., [Doc. 42-4], at ¶¶ 9-10;

[6] *Id.*

[7] Foster Aff., Ex. 3 to Pl.'s Opp. to Mot. for Summ. J., [Doc. 42-5], at ¶ 4; Rehman Aff. at ¶ 11.

commence cleanup.[8]  During this time, Pioneer was also sued by two neighboring landowners: Kevin Rutherford and Andrew J. Vaughn and Gaylin Richard.[9]

## B. Steadfast Umbrella Policy and Relevant Exclusions/Endorsements

At the time of the blowout, Pioneer had a "control of well" insurance policy issued by Lloyds of London, which provided for $5 million in coverage for costs incurred because of a well failure.[10]  Pioneer was also insured by Steadfast under two policies: a commercial liability policy and a commercial umbrella policy, both having terms of April 7, 2007 to April 7, 2008.[11] Pioneer's expenses in controlling/plugging the well and remediating the damage from the blowout soon exceeded the $5 million limit on the Lloyd's of London policy.  In total, Pioneer incurred roughly $7.1 million to control and plug Meaux No. 1 Well, $6.4 million to construct the levees and impoundments and haul away the salt water, and $1.2 million to perform environmental remediation on the Meaux and Rutherford properties.  Pioneer also incurred $91,814.30 in defense costs and $56,354.16 in settlement costs for the Rutherford and Vaughan/Richard lawsuits.[12]

After Pioneer requested coverage for its costs (over the $5 million paid by the Lloyd's of London policy), Steadfast denied coverage.  Pioneer then filed this lawsuit, seeking defense, indemnity, and bad faith penalties.

---

[8] Compliance Order, Ex. 4 to Pl.'s Opp. to Mot. for Summ. J., [Doc. 42-6].

[9] Def.'s Statement of Uncontested Material Facts at ¶ 4; *see also* "Kevin Rutherford v. Pioneer Exploration, LLC Petition," Ex. 7 to Pl.'s Opp. to Mot. for Summ. J., [Doc. 42-8]; Andrew J. Vaughan and Gaylin Richard v. Pioneer Exploration, LLC Petition," Ex. 7 to Pl.'s Opp. to Mot. for Summ. J., [Doc. 42-9].

[10] Rehman Aff. at ¶ 6.

[11] Def.'s Statement of Uncontested Material Facts at ¶ 5; Rehman Aff. at ¶ 6; Commercial General Liability Policy from Steadfast, Att. 2 to Rehman Aff., [Doc. 42-3] at pp. 15 – 89; Umbrella Policy from Steadfast, Att. 3 to Rehman Aff., [Doc. 42-3] at pp. 90 – 138.

[12] Rehman Aff. at ¶¶ 12 – 13.

After removal, Pioneer filed its First Amended Petition for Coverage, amending the original petition to include the fact that the Meauxs had also filed suit against Pioneer, and that Steadfast had also denied coverage for this claim.[13]  Subsequently, the Rutherford and Vaughn/Richard suits settled in December 2009, and the Meaux case was dismissed in January 30, 2012 after Pioneer finished remediation on the Meaux property.[14]

Originally, Pioneer sought coverage for post-blowout costs under both the primary policy and the umbrella policy.  Pioneer's counsel has since conceded that coverage does not exist under the primary policy, and thus the dispute in this motion is whether the umbrella policy covers Pioneer's claims.

The umbrella policy has two types of coverage: Coverage A and Coverage B.  Where coverage is afforded by underlying insurance, Coverage A of the policy is applicable.  When there is no coverage afforded by underlying insurance, Coverage B is applicable.  The parties agreed during oral argument that Coverage B applies, as there is no coverage provided by underlying insurance.  The relevant provisions of Coverage B are as follows:

1. **General Description of Coverage B in Umbrella Policy**

The portion of the policy related to Coverage B provides, in relevant part:

B. Coverage B—Umbrella Liability Insurance.

Under Coverage B, [Steadfast] will pay on behalf of [Pioneer], sums as damages [Pioneer] becomes legally obligated to pay by reason of liability imposed by law or assumed under an insured contract because of bodily injury, *property damage*, or personal and advertising injury covered by this insurance *but only if the injury, damage or offense arises out of your business, takes place during the policy period of this policy and is caused by an occurrence happening anywhere. We*

---

[13] Amended Compl., [Doc. 15]; *see also* "John Brent Meaux and Jimmie Ann Meaux McLean v. Pioneer Exploration LLC Petition," Ex. 5 to Pl.'s Opp. to Mot. for Summ. J., [Doc. 42-7].

[14] Def.'s Statement of Uncontested Material Facts at ¶¶ 6 –7; Pl.'s Resp. to Def.'s Statement of Uncontested Material Facts at ¶¶ 6 –7.

*will pay such damages in excess of the Retained Limit specified in Item 5 of the Declarations* or the amount payable by other insurance, whichever is greater.

Coverage B will not apply to any loss, claim or suit for which insurance is afforded under underlying insurance or would have been afforded except for the exhaustion of the limits of insurance of underlying insurance.[15]

A representative of Steadfast was deposed and admitted that the Meaux Well No. 1 blowout meets the definition of an occurrence that happened during the policy period, and that the blowout arose out of Pioneer's business, thus indicating that coverage would be available under the policy.[16] This general description is not the end of the inquiry, however.

## 2. Property Damage Exclusion in Main Part of Policy

Steadfast references a few sections of the policy to show that Pioneer's Meaux No. 1 Well claims are not covered by the umbrella policy. The first exclusion, the Property Damage Exclusion, is found in the main part of the policy:

C.  Under Coverage B this policy does not apply to:

***

PROPERTY DAMAGE

8.  Property damage to:

a.  *Property you own, rent or occupy*, including any costs or expenses incurred by you, or any person or organization or entity, for *repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property.*[17]

---

[15] Umbrella Policy, Att. 1 to Pl.'s Mot. to Compel, [Doc. 28-1], at p. 4 (emphasis added).

[16] Steadfast Dep., Ex. 8 to Pl.'s Opp. to Mot. for Summ. J., [Doc. 42-10], at pp. 68 – 70.

[17] Umbrella Policy at p. 13.

Steadfast argues that because Pioneer had a mineral lease on the land it cleaned up, this constitutes property it "rented or occupied," thus precluding coverage under the umbrella policy. It also argues that, to the extent Pioneer incurred costs to prevent damage to third parties' land, this provision of the policy explicitly excludes coverage for those costs.

### 3.  Oil Industry Limitation Endorsement

Pioneer also obtained an endorsement called "Oil Industry Limitation Endorsement," which changed the umbrella policy as follows:

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY

Under Coverage A. and Coverage B., such insurance as is afforded by this policy is subject to the following additional exclusion:

This policy shall not apply to any obligation or liability incurred by or imposed upon any insured arising out of:

A. 1. loss of hole and in-hole equipment, including retrieval cost;

2. *any cost or expense incurred by or at the request of any insured or any co-owner of a working interest in connection controlling or bringing under control any oil, gas or water well which becomes out of control.* A well shall be deemed out of control only so long as there is a continuous flow of drilling fluid, oil, gas or water above the ground or ocean floor which is uncontrollable;

3. removal of debris, damaged property, or wreckage;

\* \* \*

B. 2. injury to or destruction of property arising located on or above the surface of the earth arising from a blowout or cratering of any well[18]

Steadfast argues that this provision excludes coverage for any costs Pioneer incurred in bringing Meaux Well No. 1 under control following the blowout.  Pioneer argues that at least a

---

[18] *Id.* at p. 34 (emphasis added).

portion of the costs bringing the well under control (namely, the costs in plugging the well)

would not necessarily fall under this exclusion.

### 4. Pollution Exclusion in Main Part of Policy

Originally, the umbrella policy also had a broad Pollution Exclusion (in the same section

as the Property Damage Exclusion mentioned *supra*).  The exclusion read as follows:

SECTION IV. EXCLUSIONS

***

C. Under Coverage B this policy does not apply to:

***

POLLUTION

6.        a. Any liability, damage, loss, cost or expense arising directly or indirectly
out of actual, alleged or threatened existence, discharge, seepage, migration,
dispersal, release or escape of pollutants.[19]

### 5. Blended Pollution Endorsement-Replaces Pollution Exclusion

Pioneer admits that this "Pollution Exclusion" would have excluded coverage for the

Meaux No. 1 Well blowout.  Because of this, Pioneer avers that it "specifically sought pollution

coverage for its operations,"[20] by requesting that the umbrella policy be changed to include a

"Blended Pollution Endorsement" which removed the Pollution Exclusion.  The Blended

Pollution Endorsement reads, in relevant part:

THIS  ENDORSEMENT  CHANGES  THE  POLICY.  PLEASE  READ  IT
CAREFULLY.

The policy is amended as follows:

---

[19] *Id.* at p. 13.

[20] Rehman Aff. at ¶¶ 5, 7.

A. SECTION IV, EXCLUSIONS, B. 1. and C. 6., POLLUTION are deleted.

B. Under Coverages A and B the policy does not apply to any liability, damage, loss, cost or expense:

> 1. Arising directly or indirectly out of an actual, alleged or threatened existence, discharge, dispersal, seepage, migration, release or escape of pollutants; or

> 2. Arising out of any:

> a. Request, demand or order that any insured or others test for, monitor, clean-up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants; or

> b. Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of pollutants.

> *3. Paragraph B.1. and B.2.a. of this endorsement does not apply to bodily injury or property damage :*

> * * *

> *c. Directly caused by any discharge, dispersal, seepage, migration, release or escape of pollutants that:*

> > *(1) Is instantaneous and demonstrable as having first commenced at a specific time and day during the policy period of this policy;*

> > *(2) Is accidental and neither expected nor intended from the standpoint of any insured;*

> > *(3) Is first discovered by any insured within seventy-two (72) hours of its first commencement; and*

> > *(4) Is reported to us by you no later than thirty (30) days following the first discovery by any insured.*

4. The coverage afforded under B.3. of this endorsement does not apply to any liability, damage, loss, cost or expense arising out of:

> a. *Clean up, removal, containment, treatment, detoxification or neutralization of pollutants existing at, or under or within the*

*boundaries of any premises, site or location owned, rented or occupied by any insured;*

\* \* \*

8. Solely as respects any insurance afforded by this endorsement:

a. *The Retained Limit* as stated in Item 5. Of the Declaration of this policy is amended to *$1,000,000 Each Occurrence*; and

b. SECTION III. DEFENSE AND SUPPLEMENTARY PAYMENTS is deleted and replaced by the following:

*We will not be obligated to assume the charge of the investigation, settlement or defense of any claim made, suit brought or proceeding instituted against any insured.* We will, however, have the right and shall be given the opportunity to participate in the defense and trial of any claims, suits or proceedings relative to any occurrence which, in our opinion, may create liability on our part under the terms of this policy. If we exercise such right, we will do so at our own expense

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.[21]

Steadfast argues that, like the Property Damage exclusion, the Blended Pollution Endorsement precludes coverage for property "owned, rented, or occupied" by Pioneer. It also references Section B(8)(a) and (b) of the Blended Pollution Endorsement for its argument that the policy did not provide coverage for the defense costs of the Meaux, Rutherford, or Vaughan/Richard suits, or settlement costs for the Rutherford and Vaughan/Richard suits.

## MOTION FOR SUMMARY JUDGMENT STANDARD

A court should grant a motion for summary judgment when the pleadings, including the opposing party's affidavits, "show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). The party moving for summary judgment is initially responsible for demonstrating the reasons justifying the motion for summary judgment

---

[21] *Id.* at p. 37.

by identifying portions of pleadings and discovery that show the lack of a genuine dispute of material fact for trial. *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995). The court must deny the moving party's motion for summary judgment if the movant fails to meet this burden. *Id.*

If the movant satisfies this burden, however, the nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* (quoting *Celotex*, 477 U.S. at 323). In evaluating motions for summary judgment, the court must view all facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). There is no genuine issue for trial, and thus a grant of summary judgment is warranted, when the record as a whole "could not lead a rational finder of fact to find for the non-moving party..." *Id.*

## LAW AND ANALYSIS

### I.   Choice of Law

At first glance, it appears that Texas law should apply to this case. During oral argument, Steadfast noted that the insurance policy was issued and executed in Texas to a Texas oil and gas company.

Under diversity jurisdiction, this court must apply the law of the forum state to determine which state's laws apply. *Mumblow v. Monroe Broadcasting, Inc.*, 401 F.3d 616, 620 (citing *Woodfield v.* Bowman, 193 F.3d 354, 359, n. 7 (5th Cir. 1999)). In insurance cases, under Louisiana's choice-of-law provisions, Louisiana courts typically apply the law of the state the "where the insurance policy was issued and executed" (here, Texas). *Am. Elec. Power Co., Inc. v. Affiliated FM Ins. Co.*, 556 F.3d 282, 285 n. 2 (5th Cir 2009); *Woodfield v. Bowman*, 193 F.3d 354, 360–61 (5th Cir.1999) (applying Mississippi law and noting that "Louisiana courts

10

generally choose the law of the state in which the insurance policy in question was issued to govern the interpretation of the terms of the policy"); *Breese v. Hadson Petroleum (USA), Inc.*, 955 F.Supp. 648, 650 & n. 5 (M.D. La.1996) (applying Mississippi law when "the policy was negotiated and executed in Mississippi"); *Resure, Inc. v. Chem. Distribs. Inc.*, 927 F.Supp. 190, 192 (M.D. La.1996) ("When confronted with similar cases, Louisiana courts consistently apply the law of the state in which the insurance policy was executed."). Further, the policy states that the policy is ". . . is issued and delivered as a surplus lines coverage pursuant to the *Texas insurance statutes.*"[22]

The Fifth Circuit has held, however, that "[i]f the laws of the states do not conflict, then no choice-of-law analysis is necessary," and a court may simply apply the law of the forum state. *Mumblow*, 401 F.3d at 620 (citing *Schneider Nat'l Transp. v. Ford Motor Co.*, 280 F.3d 532, 536 (5th Cir.2002)). This court finds that because Texas law[23] and Louisiana law (discussed *infra*) do not conflict on the issue of insurance contract interpretation, the court shall apply Louisiana law.

## II. Louisiana Insurance Contract Interpretation

---

[22] *Id.* at p. 6.

[23] Under Texas's general insurance contract interpretation guidelines:

> The primary concern of a court in construing a written contract is to ascertain the true intent of the parties as expressed in the instrument. If a written contract is so worded that it can be given a definite or certain legal meaning, then it is not ambiguous. Parol evidence is not admissible for the purpose of creating an ambiguity.

> If, however, the language of a policy or contract is subject to two or more reasonable interpretations, it is ambiguous. Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered. Only where a contract is first determined to be ambiguous may the courts consider the parties' interpretation, and admit extraneous evidence to determine the true meaning of the instrument.

*Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995) (citations omitted).

As correctly noted by both parties, insurance contracts like the one in this case are subject to the rules of contract construction found in the Louisiana Civil Code. *Cadwallader v. Allstate Ins. Co.*, 2002-1637 (La. 6/27/03); 848 So. 2d 577, 580 (citing *Carbon v. Allstate Ins. Co.*, 97-3085 (La. 10/20/98), 719 So. 2d 437, 439; *Louisiana Ins. Guar. Ass'n v. Interstate Fire & Cas. Co.*, 93-0911 (La. 1/14/94), 630 So. 2d 759, 763). When interpreting an insurance contract, the court must discern the parties' common intent. *Louisiana Ins.*, 630 So. 2d at 763; *see also* La. Civ. Code art. 2045. "The parties' intent, as reflected by the words of the policy, determines the extent of coverage." *Parekh v. Mittadar*, 2011-1201 (La. App. 1 Cir. 7/20/12); 97 So. 3d 433, 437 (citing *Ledbetter v. Concord Gen. Corp.*, 95–0809 (La. 1/6/96), 665 So.2d 1166, 1169, *decree amended*, 95–0809 (La. 4/18/96), 671 So.2d 915).

When the terms of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the intent of the parties. La. Civ. Code art. 2046. "If the policy wording at issue is clear and unambiguously expresses the parties' intent, the insurance contract must be enforced as written. Courts lack the authority to alter the terms of insurance contracts under the guise of contractual interpretation when the policy's provisions are couched in unambiguous terms." *Cadwallader*, 848 So. 2d at 580 (citations omitted). "An insurance policy should not be interpreted in an unreasonable or a strained manner so as to enlarge or restrict its provisions beyond what is reasonably contemplated by its terms or to achieve an absurd conclusion." *Parekh*, 97 So. 3d at 437 (citing *Reynolds v. Select Properties, Ltd.*, 93–1480 (La.4/11/94), 634 So.2d 1180, 1183).

If, however, the insurance contract terms are ambiguous, these ambiguities are generally strictly construed against the insurer and in favor of coverage. *Cadwallader*, 848 So. 2d at 580; La. Civ.Code art. 2056. Strict construction will apply "only if the ambiguous policy provision is

susceptible to two or more *reasonable* interpretations; for the rule of strict construction to apply, the insurance policy must be not only susceptible to two or more interpretations, but each of the alternative interpretations must be reasonable." *Id.* (citations omitted).

### III. The Insurance Policy

Steadfast argues that the five different types of damages for which Pioneer seeks coverage are all precluded by the plain terms of the umbrella insurance contract. The damages are as follows: (1) bringing the well under control after the blowout; (2) defense costs incurred in connection with the Meaux, Rutherford, and Vaughan/Richard suits; (3) settlement of the Rutherford and Vaughan/Richard suits; (4) attorneys' fees incurred in connection with bringing this suit; and, (5) clean up costs (remediation and containment of salt water and fluids) following the blowout. The court will address each category of damages in turn.

#### A. Control of Well Expenses

Steadfast first argues that, based on the Oil Industry Limitation Endorsement, it is clear that the umbrella policy "excludes coverage for 'any cost or expense incurred by or at the request of any insured . . . in connection controlling or bringing under control any oil, gas or water well which becomes out of control.'"[24] In oral argument, Pioneer's counsel conceded that the policy might exclude coverage for some costs incurred in bringing the well under control, but argued that plugging the well would not fall under this exclusionary clause because the well no longer counted as a "well out of control" under the definition of the policy at that time Pioneer plugged it.[25] Pioneer did not specify how much of the $7.1 million in control of well costs was spent on plugging it.

---

[24] Umbrella policy at p. 34.

[25] A well out of control is defined in the policy as a well that has "continuous flow of drilling fluid, oil, gas or water above the surface of the ground or ocean floor which is uncontrollable." *Id.*

Reviewing the policy language, the undersigned finds that the Oil Industry Limitation Endorsement unambiguously excludes all control of well expenses. Plugging a well would be the final step in "bringing under control" a blown out well, and thus Pioneer's argument against exclusion of well plugging costs is unavailing. Accordingly, the court will grant summary judgment in favor of Steadfast, finding that the clear terms of the policy preclude coverage for the $7.1 million Pioneer spent controlling and plugging the Meaux Well No. 1.

**B. Defense Costs**

Steadfast next contends that the Blended Pollution Endorsement states that Steadfast has no duty to defend Pioneer against pollution claims, which means that Steadfast does not have to provide Pioneer coverage for expenses it incurred in defending the Meaux, Rutherford, or Vaughan/Richard suits.[26] During oral argument, Pioneer's counsel conceded that it did not contest Steadfast on this point. Further, the clear terms of the policy provide that Steadfast "will not be obligated to assume charge of the investigation, settlement or defense of any claim made, suit brought or proceeding instituted against any insured."[27] Accordingly, the court will grant summary judgment in favor of Steadfast, finding that the uncontested evidence shows that coverage for the $91,814.30 Pioneer spent in defense costs is excluded under the policy.

**C. Settlements for Rutherford and Vaughan/Richard Suits**

Steadfast next argues that because the Rutherford and Vaughan/Richard suits settled collectively for $58,665.00, this amount is "well within the $1,000,000.00 retained limit specified in the Blended Pollution Endorsement," which means that Pioneer is responsible for these costs. During oral argument, Pioneer's counsel conceded that it did not contest Steadfast

---

[26] *Id.* at p. 39.

[27] *Id.*

on this point. Additionally, the terms of the policy unambiguously provide for a $1,000,000 retained limit.[28] Accordingly, the court will grant summary judgment in favor of Steadfast, finding that the uncontested evidence shows that coverage for the $56,314.16 Pioneer spent in settlement costs is excluded under the policy.

### D. Pioneer's Attorneys' Fees in this Suit

Steadfast argues that Pioneer is seeking attorneys' fees incurred in pursuing this action under La. Rev. Stat. ann. §§ 22: 1973 and 1892, but that these statutes both require "conduct on the part of the insurer that is 'arbitrary, capricious, or without probable cause.'" Steadfast argues that because its denial of coverage is supported by "controlling precedent," bad faith damages are unavailable. Pioneer did not specifically address this argument in its briefs or during the hearing, although presumably its argument is that Steadfast did act in an arbitrary or capricious manner because the case law did not support its interpretation of the policy.

For the reasons discussed *infra*, the court finds that Steadfast denied coverage because the clear terms of the policy precluded coverage, and this conclusion is supported by case law within the Fifth Circuit. Accordingly, the court grants summary judgment in favor of Steadfast on this issue, finding that Pioneer may not seek attorneys' fees against Steadfast.

### E. Remediation and Containment Costs

Finally, the court turns to the bulk of the parties' argument: whether Pioneer's remediation costs and pollution containment costs were covered under the policy.

### 1. Remediation Costs

---

[28] *Id.*

The parties' first contention is whether the "owned leased property"[29] exclusion language even applies to Pioneer, who had a mineral lease on the land it remediated.  If it does, then remediation costs for the land Pioneer had a mineral lease on would be unavailable under the policy.

Pioneer relies on *Devon Energy Prod. Co., LP v. American Int'l Specialty Lines Ins*, No. H-08-1353, 2009 WL 1256971 (S.D. Tex., May 4, 2009), an unpublished case in which the Southern District of Texas's Judge Hughes found that a mineral lease would not fall under an "owned leased property" exclusion. *Id.* at *3.  Ultimately, Judge Hughes's discussion of mineral leases was not controlling on the court's holding, however, as Judge Hughes addressed a situation in which the contamination only affected land *not* subject to a mineral lease with the insured oil and gas company. *See id.*  The persuasiveness of this case is thus limited.

The next case the parties discuss is the unpublished Eastern District of Louisiana opinion from Judge Africk, *Aspen Ins. UK, LTD. v. Dune Energy, Inc.,* No. 09-2906, 2010 WL 996550 (E.D. La., Mar. 16, 2010) (aff'd, *Aspen Ins. UK, Ltd. v. Dune Energy, Inc.*, 400 Fed. App'x. 960 (5th Cir. 2010)).  In *Aspen*, an oil company (Dune 0 sought coverage from its insurer (Aspen) for the restoration of property it leased following the failure of a flowline. *Id.* at *1.  Aspen disclaimed coverage, noting that the policy did not provide coverage because it excluded damage to "property rented or occupied by the insured and excludes pollution liabilities if the damage occurs to property leased by, or in the care, custody or control of the insured." *Id.*  Unlike in *Devon Energy*, Dune was exclusively claiming coverage for damage sustained to land on which it had a mineral lease. *Id.*  Citing the reasoning in *Devon Energy*, Dune similarly argued that the

---

[29] This is a term of art used by courts, referring to the "owned, rented, or occupied" language in the umbrella policy.

"owned leased property" policy exclusions did not apply, because it only had a mineral lease on

the land. *Id.* at *3. Judge Africk rejected this argument, finding:

> Dune's argument that its mineral lease did not extend to the damaged property is
> of no consequence. In addition to excluding damage to property that Dune owns,
> rents, or occupies, the unambiguous language of the policy excludes coverage for
> "the soil, minerals, water or any other substance on, in or under such owned,
> leased, rented or occupied property." The damage claimed by Dune occurred on
> the physical property that it leased. The Court will not search for a deeper
> meaning within the contract in order to create ambiguity where none exists.
> Because there is only one reasonable interpretation of the contract, there is no
> genuine issue of material fact to preclude summary judgment.

*Id.*

Dune subsequently appealed Judge Africk's decision to the Fifth Circuit. In an

unpublished decision, the Fifth Circuit affirmed:

> Dune argues [that] the district court erred in finding that the insurance policy
> unambiguously excluded coverage for the pollution on the property on which
> Dune held the Mineral Lease and operated the leaking flowline. We agree with
> the district court . . .
>
> Critically, Dune does not argue that any of the pollution affected property outside
> of that covered by its Mineral Lease. Dune does, however, argue that its Mineral
> Lease granted Dune the limited right to use the surface as was reasonably
> necessary to explore for, drill, and produce oil and gas, but conveyed no title to
> the surface of the land. The superior ownership and rights of use of the surface,
> Dune continues, remain vested in the owner of the property, who is not a party to
> the insurance policy. Therefore, Dune asserts, the coverage it has requested is for
> damage to a third party's property, not to its own property. Dune argues that it can
> meet the five specified conditions required for coverage for pollution of another
> party's property. Therefore, Dune concludes, the Endorsement cannot exclude
> coverage for damage to the property affected.
>
> Dune may be correct that it has no ownership rights or unlimited right to use the
> surface of the land on which it has the Mineral Lease, but its argument is
> ultimately unavailing. Dune has presented no evidence that would raise a genuine
> issue as to whether the insurance policy covers the damage to the property
> covered by its Mineral Lease. The exclusionary provision in the Endorsement
> must be strictly construed, but in doing so we will not "creat[e] an ambiguity
> where none exists."

Even if we accept Dune's argument that its Mineral Lease does not give it "care, custody or control" over the affected surface property, the language of the Endorsement is broader than Dune's representation of it. The Endorsement also excludes coverage for the "soil, minerals, water or any other substance on, in or under such owned, leased, rented or occupied property or property in such care, custody or control." Dune does not dispute that it actually occupies some of the affected property; in addition, under its Mineral Lease, Dune has the right to occupy all of the land covered by the Lease for the purpose of exploring for and producing oil and gas. The pollution resulting from the leak affected the soil, minerals, water, and other substances on that leased and occupied property. Dune has presented no evidence, and no legal authority, for the premise that its Lease somehow gives it an intangible right to the minerals without a right to occupy the property—in fact, the language of the Lease and established Louisiana law give Dune substantial rights to occupy, care for, take custody over, and control the property, soil, and minerals polluted by Dune's leaking flowline.

*Aspen*, 400 Fed. App'x. at 962–63 (internal footnotes omitted).

Comparing the "owned leased property" exclusions to the one in *Aspen*, the two are different, but similarly broad.  In *Aspen*, the "owned leased property" exclusion read, in whole:

[The policy does not provide coverage:] for seepage, pollution or contamination of property which is or was, at any time, owned, leased, rented or occupied by any insured, or which is or was, at any time, in the care, custody, or control of any insured (including the soil, minerals, water or any other substance on, in or under such owned, leased, rented or occupied property or property in such care, custody or control).

*Aspen*, 2010 WL 996550 at *2.

Steadfast's umbrella policy's "owned leased property" exclusion in its Property Damage section reads:

[Coverage shall not apply to p]roperty you own, rent or occupy, including any costs or expenses incurred by you, or any person or organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property.[30]

---

[30] *Id.* at p. 13.

18

And the "owned leased property" exclusion in the Blended Pollution Endorsement is a little different, and slightly broader:

> [Coverage shall not apply to] clean up, removal, containment, treatment, detoxification or neutralization of pollutants existing at, or under or within the boundaries of any premises, site or location owned, rented or occupied by any insured.[31]

As in *Aspen*, the undersigned will not "search for a deeper meaning" in the face of unambiguous policy terms: the policy precludes coverage for the costs Pioneer incurred in performing remediation on the land it "rented" or "occupied" through the mineral lease, including "pollutants existing at, or under or within the boundaries" of that property. While Pioneer is correct that *Aspen* is an unpublished case, and thus is technically not controlling precedent, the court may still use the case as persuasive in the absence of applicable controlling precedent. Accordingly, the portion of the $1.2 million in costs Pioneer incurred to remediate the land on which it had a mineral lease are not covered by the clear terms of the policy, and thus summary judgment in favor of Steadfast is proper on this issue.

### 2. Expired Mineral Lease

Next, Pioneer makes the argument that, if the court finds the "owned leased property" exclusion precludes coverage, some of the remediation costs may still be covered. Essentially, because Pioneer's mineral lease expired during the time it was performing remediation, the "owned leased property" exclusion wouldn't apply to the costs associated with remediating after the lease expiration. Steadfast responds that the umbrella policy was an "occurrence" policy. Thus, the only relevant date is when the actual blowout happened (January 2008), a time period during which Pioneer had a mineral lease over the contaminated area. The undersigned finds Pioneer's argument on this point irrelevant, as this policy was in fact an occurrence policy. The

---

[31] *Id.* at p. 38.

court will not construe the clear terms of the policy in a "strained manner" to find that coverage would exist over some remediation costs simply because the lease fortuitously expired a few months after clean up began.

### 3.  Prevention of Contamination to Third Parties

### a.  Preventing Threat of Contamination

Pioneer next makes the argument in its opposition brief that its efforts to impound and remove salt water were not incurred to "repair, enhance, or maintain" the Meaux property, but instead were done to protect Pioneer from further liability from third parties and the LDNR, and prevent the contamination from seeping onto neighboring lands.  It further notes that, according to Louisiana jurisprudence, the underlying purpose of "owned leased property" exclusions has always been to "protect the insurance company against the incentive a policyholder may have to falsify or exaggerate a claim if essentially seeking to repair or improve his or her own property." In this case, because Pioneer was primarily trying to protect neighboring lands from contamination, the "owned leased property" exclusion would not apply.

In this portion of its argument, Pioneer mostly relies on the Louisiana First Circuit case, *Norfolk Southern Corp. v. California Union Ins. Co.*, 2002-0369 (La. App. 1 Cir. 9/12/03); 859 So.2d 167, in which the court addressed whether an "owned property" exclusion would defeat coverage of the "remediation of an insured's property undertaken to eliminate or mitigate a threat to third-party property." *Id.* at 193.  The court first surveyed decisions from other courts:

> Courts in other jurisdictions have abrogated the owned property exclusion in certain cases where there is evidence of a verifiable, actual, and imminent threat to groundwater or adjacent property not owned by the insured . . . Other courts, however, have determined that the owned property exclusion does operate to preclude recovery for costs expended to prevent only threatened harm to third-party property, even if future harm to third-party property was prevented.

*Id.* at 194 (internal citations omitted).  Addressing its fact pattern, the *Norfolk* court found that because there was a record of actual damage to third party property, and because the insured incurred expenses removing the sources of contamination to prevent further contamination to third-party property, the remediation costs would not be excluded from coverage because of the "owned property" exclusion. *Id.* at 194–95.  Because there was already actual damage to third-party property, however, the *Norfolk* court did not "address the situation in which remediation is undertaken in response to the mere *threat* of damage to third-party property." *Id.* at 195 (emphasis in original).

The Fifth Circuit has also addressed this issue, in the 1994 case *Figgie Intern., Inc. v. Bailey*, 25 F.3d 1267 (5th Cir. 1994).  In *Figgie*, Figgie International acquired and then later sold two manufacturing facilities to Norris Industries, agreeing as part of the sales contract to indemnify Norris for "all damages arising out of the proper conduct of Figgie's business." *Id.* at 1268.  During the period Figgie owned the property, it was insured by several different insurance policies. *Id.*

After Figgie sold the property to Norris, the Louisiana Department of Environmental Quality determined that hazardous wastes had been discharged from the manufacturing facilities on the property, and required Norris to undertake remedial action (namely, removing sludge from sedimentation ponds). *Id.* at 1268–69.  Norris and Figgie performed this remediation together, and then Figgie sought coverage from its insurers when Norris requested indemnification from Figgie. *Id.* at 1269.  The insurers refused to provide coverage, arguing that their "owned property" exclusions applied to the property at issue because the remedial action had solely taken place on land owned by Figgie, and no third party had made a claim for

damages. *Id.* One of Figgie's counterarguments was that preventing the threat of contamination of third party property defeated the "owned property" exclusion. *Id.* at 1272.

The Fifth Circuit concluded that, in its case, it did not need to resolve the issue of whether owned property exclusions included "mere threats of contamination to property" because Figgie had failed to produce competent summary judgment evidence that the contamination was an actual threat to third party property. *See id.* at 1272–73.  Courts in Louisiana construing *Figgie* have found that, in cases in which there is an "owned property" exclusion, if the insured fails to show a verifiable imminent threat to any property not owned by the insured, coverage is not available. *See Pro-Boll Chem. & Fertilizer Co. v. U.S. Fire & Guar. Co.*, No. Civ. A.01-1531, 2004 WL 3495324, *7-*8 (W.D. La., Nov. 15, 2004) (finding that "owned property" exclusion applied because the insured did not allege damage to third party property and expended no money cleaning up third party property); *Assumption Parish Sch. Bd. v. Mt. Airy Ins. Co.*, No. Civ.A.95-646, 1995 WL 626151 (E.D. La., Oct. 23, 1995) (finding that "owned property" exclusion applied because the insured did not present any evidence that spraying of chemicals threatened third party property).

The parties noted during oral argument that Pioneer had performed some clean up of third party land: namely, a portion of the Rutherford tract.  Steadfast argued, however, that Pioneer had no itemization of how much of the $1.2 million in remediation costs was actually spent on Rutherford's property, and that, at any rate, these costs would be subject to the $1 million retained limit.  Surveying the extent of damage on the Meaux land versus the Rutherford land, Steadfast argued that it was unlikely that more than $1 million of the remediation costs were spent on the Rutherford land, based on the fact that almost all of the contamination was on the Meaux land instead.  Pioneer did not provide a counterargument for this issue.  The undersigned

notes that, if Pioneer presents an itemization of remediation costs for Rutherford's land, and these costs exceed the $1 million limit, then these damages would be covered by the umbrella policy (a point Steadfast concedes). Absent an itemization, however, the undersigned cannot express an opinion on whether Steadfast must provide coverage for these remediation costs.

Turning to the costs Pioneer incurred to prevent contamination from spreading, Steadfast argues that this is a "distinction without a difference, not only because the "owned leased property" exclusions in the main policy and the Blended Pollution Endorsement do not provide for coverage, but also because the Blended Pollution Endorsement further excludes coverage for "clean up, *removal, containment*, treatment, detoxification neutralization of pollutants" within the boundaries of the premises "owned, rented or occupied by [Pioneer]."[32] Thus, because all of the removal and containment happened on the Meaux property, coverage is still not available under the umbrella policy. Steadfast also points us to the relevant exclusion language in the Property Damage portion of the policy, which precludes covering costs incurred for "*prevention of injury to a person or damage to another's property*."[33]

Even taking into account the case law on prevention of contamination to third parties, the clear terms of the policy preclude coverage for costs incurred in containing/removing pollutants and preventing damage to third party's property. While Pioneer made the policy argument during the motion hearing that a finding of no coverage on this issue would encourage oil companies to allow contamination to spread until it does seep onto third party land (as opposed to containing the contamination), this is immaterial. This court's duty in a diversity case is to "employ the appropriate Louisiana methodology" to decide the issue the way it believes the

---

[32] *Id.* at p. 39 (emphasis added).

[33] *Id.* at p. 13 (emphasis added).

Louisiana Supreme Court would decide it. *Shaw Constructors v. ICF Kaiser Eng'rs, Inc.*, 395 F.3d 533, 546 (5th Cir. 2004) (quoting *Lake Charles Diesel, Inc. v. Gen. Motors Corp.*, 328 F.3d 192, 197 (5th Cir.2003)).  Under Louisiana law, when the terms of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the intent of the parties. La. Civ. Code art. 2046. As the terms of the policy are unambiguous and point to exclusion of prevention of contamination costs, therefore, summary judgment is appropriate in favor of Steadfast on this issue.

### b.  Costs incurred because LDNR Made Pioneer Remediate

Pioneer also addresses the issue of whether the "owned leased property" exclusion covers governmentally mandated costs to clean up the Meaux tract and contain the pollution.  As noted by the Eastern District of Louisiana's Judge Sear in *Assumption Parish School Board v. Mt. Airy Insurance Co.*,

> Whether governmentally mandated clean-up costs fall within an "owned property" exclusion has not been addressed by the Louisiana Supreme Court or any lower Louisiana state court. *Figgie*, 25 F.3d at 1273. However, the issue has been resolved, with differing conclusions, in a number of other jurisdictions. Courts have, on occasion, found that the "owned property" exclusion does not defeat coverage of an insured's remediation efforts.

> [One view] relieves the insured of the operation of the owned property exclusion where governmentally-ordered remediation rises to the level of a suit against the insured under state law for maintenance of a nuisance. [Applying that reasoning to this case, the insured] does not argue that it is entitled to relief under a nuisance theory or that the orders issued by the LDAF rise to the level of a "suit" under state law to abate a nuisance. . . .The orders themselves specifically provide that [the insured] may be subject to enforcement procedures under La.R.S. 3:3278, i.e. a civil action or civil penalties. Further, the general and traditional definition of a suit under Louisiana law refers to a formal proceeding in a court of law. Finally, nothing in the LDAF orders suggests that the LDAF considered the presence of [contamination] on [the insured's] property so extensive as to constitute a threat to third party property or a nuisance.

1995 WL 626151 at *5 – *6.

As in the *Assumption Parish* case, there is no evidence here that LDNR's Compliance Order rises to the level of a suit against Pioneer. The Compliance Order simply notes that Pioneer will be subject to fines if it does not clean up the contamination – there is no mention of a "formal proceeding in a court of law." This argument is thus unpersuasive to the court.

### 4. Contract Reformation Argument

Pioneer also makes the argument that it was the intent of Steadfast and Pioneer to provide for third party liability coverage in situations just like this. In support, Pioneer provides: (1) an affidavit from a "veteran insurance consultant," Gary Beck, who opines that "owned leased property exclusions do not apply to expenses incurred by an insured to protect or repair a third person's land, and/or to protect the insured and insurer"[34] and (2) the deposition transcript from Steadfast's representative, in which the representative admitted "the purpose of Steadfast's policy was to protect against liability to third persons."[35] Pioneer notes that it specifically purchased the Blended Pollution Endorsement for its umbrella policy because it wanted to obtain pollution coverage in situations just like the one in this case, and that Steadfast "clearly understood it was insuring these kinds of risking when selling insurance to Pioneer." As such, Pioneer asserts that it makes no sense Steadfast is now arguing that the umbrella policy does not provide coverage, because if this is true, it would mean "Steadfast knowingly and deceptively sold Pioneer worthless pollution coverage that did not apply to the very locations – mineral leases – Pioneer told Steadfast it conducts operations."

Steadfast counters that if Pioneer had wanted insurance coverage to protect it against costs like this, then it was Pioneer's broker's duty to advise Pioneer on what its insurance policy

---

[34] Beck aff. at ¶ 20.

[35] Steadfast Dep. at pp. 81:6–82:10.

should include, and not Steadfast's duty to advise Pioneer.  It notes that "Pioneer cannot point to one sentence where it asked Steadfast if pollution damage to property subject to a mineral lease would be covered, where Steadfast represented what would be covered by its policies or where Steadfast made any recommendations to Pioneer as to what products it should purchase." Steadfast also argues that Pioneer did have coverage for the costs it incurred under the Lloyd's of London policy, and that the only reasons Pioneer is coming after Steadfast is because it "simply did not have enough [coverage]" under the Lloyd's policy.

"As other written agreements, insurance policies may be reformed if, through mutual error or fraud, the policy as issued does not express the agreement of the parties." William Shelby McKenzie and H. Alston Johnson, III, *Louisiana Civil Law Treatise: Insurance Law and Practice,* Vol. 15, § 5, p. 14. "In the absence of fraud, the party seeking reformation has the burden of proving a mutual error in the written policy." *Id.* "Parole evidence is admissible to show mutual error even though the express terms of the policy are not ambiguous." *Id.* In *Ferguson v. Belcher and Son,* 230 La. 422, 88 So.2d 806 (1956), the Louisiana Supreme Court indicated that "the burden is on the one seeking the reformation to prove the error, and he must carry said burden by clear, and the strongest possible proof." *Id.*  This requirement was modified in *Bonadona v. Guccione,* 362 So.2d 740 (La.1978), which held that the clear and convincing evidence of mutual mistake was necessary only when a party sought to prove that the insurer had insured a substantially different and greater risk than that expressed by the written policy. *Id.* On the other hand, only the normal burden of proof by a preponderance of the evidence was required to reform a policy in a manner which did not substantially affect the risk assumed by the insurer. *Id.*

In this instance, Pioneer has provided no summary judgment evidence that Pioneer fraudulently represented the scope of the insurance coverage to Pioneer. If Pioneer intends to show mutual mistake instead, it must meet this burden with clear and convincing evidence, since reformation of the contract would indicate that Steadfast had insured a substantially greater risk than expected based on the policy terms. Pioneer cannot meet this burden. As noted by Steadfast during oral argument, conspicuously absent from Pioneer's opposition evidence is an affidavit from the actual broker who procured the Steadfast policy, indicating that the parties intended to provide coverage for costs such as the ones incurred in this case. Indeed, the only evidence Pioneer has in support of its argument is (1) an affidavit from an insurance consultant who was not even involved in the selection of the policy; and (2) an excerpt from Steadfast's deposition, from which Pioneer makes the inferential argument that Steadfast admitted coverage would exist in instances where Pioneer prevented third party contamination. Further, Steadfast is correct that the negotiation of this policy was between Pioneer's broker and Steadfast, two sophisticated parties certainly familiar with insurance policies. Indeed, it was Pioneer's broker's *duty* to procure the desired policy for Pioneer. *See Gulf Coast Bldg. Sys., Inc., v. United American Sur. Co.*, 92-255 (La. App. 3 Cir. 3/3/93); 614 So. 2d 1360 ("The jurisprudence has recognized that a broker's fiduciary duty includes advising his client with regards to recommended coverage . . ."). Accordingly, the clear terms of the policy will not be reformed to allow for coverage of Pioneer's incurred costs.

## CONCLUSION

In conclusion, the court finds that the clear terms of the policy exclude coverage for the costs incurred in the aftermath of the Meaux No. 1 Well blowout. Accordingly, the court grants summary judgment in favor of Steadfast.

Lake Charles, Louisiana, this ___ day of _____ 2013.

PATRICIA MINALDI
UNITED STATES DISTRICT JUDGE